**UNITED STATES of America,**

v.

**David BARROSO, Defendant.**

**No. 99CR1025 (SAS).**

United States District Court,
S.D. New York.

Aug. 7, 2000.

Victor Olds, Timothy Coleman, United States Attorney's Office, Southern District of New York, New York City, for U.S.

Ian J. Yankwitt, Yuanchung Lee, The Legal Aid Society, Federal Defender Division, New York City, for David Barroso.

## *OPINION & ORDER*

SCHEINDLIN, District Judge.

On February 18, 2000, following a four-day jury trial, defendant David Barroso was convicted of conspiracy to commit securities and wire fraud. Defendant now seeks a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, a new trial pursuant to Federal Rule of Criminal Procedure 33. For the following reasons, defendant's post-trial motions are denied.

### I. Background

In a single-count indictment, the Government charged Barroso and two co-defendants, Marlon and Frederick Tropeano, with conspiring to defraud customers of Briarwood Investment Counsel, Inc. ("Briarwood"), a brokerage firm with a branch office located at 40 Exchange Place in Manhattan. Both Tropeanos worked as brokers for Briarwood, and Marlon Tropeano managed the 40 Exchange Place office. Barroso had previously worked for a brokerage firm called Chatfield Dean but was unemployed during the time of the charged conspiracy—March 1997 through April 1998.

According to the indictment, Barroso and the Tropeanos used forged documents such as address change requests, letters of authorization and account opening applications to transfer four customer accounts from Briarwood to two other brokerage firms—Chatfield Dean and Royal Hutton—without the customers' permission or knowledge. The indictment alleged that once the accounts were transferred, Barroso and the Tropeanos liquidated the securities in the accounts and transmitted the proceeds to their own bank accounts or to bank accounts of entities and persons they controlled.

Marlon and Frederick Tropeano pleaded guilty on February 10, 2000 and February 11, 2000 respectively. Trial commenced against Barroso on February 15, 2000.

At trial, the government introduced evidence connecting Barroso to the transfer of an account owned by Don and Irene Borders from Briarwood to Chatfield Dean. The key evidence consisted of six taped telephone conversations between Barroso and two Chatfield Dean brokers, Robert Garrett and Mark Aguanno. *See* Government Exhibits ("GX") 10T–12T, 15T–17T. In the recorded conversations, Barroso tells Aguanno and Garrett about his "friend" Don Borders. *See id.* Barroso states that Borders wants to transfer his account from Briarwood to Chatfield Dean. *See id.* Barroso asks Garrett and Aguanno to arrange the transfer, as well as the subsequent liquidation of hundreds of shares of securities in the Borders account. *See id.* During the phone conversations, Barroso is audibly anxious and pushes Garrett and Aguanno to complete the transfer and liquidation of the Borders account as quickly as possible. For example, Barroso tells the men: "Dude, you gotta jump on this", *see* GX 10T, and "We need the money man", *see* GX 11T.

During later conversations, Garrett and Aguanno ask Barroso whether he really knows Don Borders, and whether Borders actually authorized the transfer. *See* GX 15T–17T. The two men explain that Briarwood, their supervisors at Chatfield Dean and the Securities and Exchange Commission have been investigating the transfer. *See id.* Garrett and Aguanno tell Barroso that, as a result of the Borders transfer, their jobs at Chatfield Dean

are in jeopardy. *See id.* In response, Barroso repeatedly insists that Borders is his "friend", and that Borders authorized the transfer. *See id.* Barroso also states that he is "good friend[s]" with Borders's son, Don Borders, Jr. *See* GX 15T. Finally, Barroso explains that Borders dislikes his Briarwood broker, a man named "Frank Fumazzi", and blames any confusion or apparent impropriety on Fumazzi's efforts to keep the Borders account at Briarwood. *See* GX 16T.

In conjunction with the taped phone conversations, the government called Don Borders who testified that he did not know Barroso, that he never authorized the transfer of his account from Briarwood to Chatfield Dean and that he did not have a son named Don Borders, Jr. *See* Trial Transcript ("Tr.") at 312, 323.[1] The government also introduced evidence that no one named "Frank Fumazzi" had ever worked for Briarwood. *See id.* at 65, 407.

Apart from the taped conversations, the government presented evidence demonstrating that (i) Barroso's half-brother, Lee Sanchez, notarized a document purportedly signed by Don and Irene Borders, *see id.* at 180–81; (ii) Barroso received a $1900 check from Marlon Tropeano drawn on an account into which stolen funds had been funneled, *see* GX 241–D; and (iii) Barroso was unemployed and in need of money, *see* Tr. at 408–10. In addition, the government introduced the Tropeanos' plea allocutions.

After the government rested, the defense called two witnesses, Donald Gioggia and Lawrence Diadato. In substance, both Gioggia and Diadato testified that Marlon Tropeano had tricked them into unknowingly facilitating Marlon's theft of the Briarwood accounts. For example, Gioggia was Marlon Tropeano's landlord. He described Marlon as a poor tenant who never paid rent on time. *See id.* at 352. Gioggia, a licensed notary, testified that on two occasions he notarized documents for Marlon, even though the signatories were not before him. *See id.* at 353. Gioggia agreed to notarize the documents in that fashion because Marlon claimed his ability to pay rent depended upon proper execution of those documents. *See id.* at 354. In reality, the documents were transfer authorizations purportedly signed by two of the defrauded Briarwood customers. *See id.* at 353. The signatures—which Gioggia notarized—were forged. *See id.*

Defense counsel used Gioggia's and Diadato's testimony to argue that Barroso was similarly "duped" by the Tropeano brothers. Defense counsel argued that the Tropeanos told Barroso that Don Borders was their uncle and that he wanted his account transferred from Briarwood to Chatfield Dean. They asked Barroso to handle the transaction, and he did so in good faith without any knowledge that he was furthering the Tropeanos' illegal conspiracy.

The jury commenced deliberations at 1:30 p.m. on February 18, 2000. At 2:05 p.m., the jury asked for a read-back of the Tropeanos' plea allocutions. The jury resumed deliberations at 2:50 p.m. Five minutes later, at 3 p.m., the jury returned a verdict of guilty.

## II. Legal Standard

■ Rule 29 provides that a court must set aside a guilty verdict and enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction." Fed. R.Crim.P. 29(a). To properly rule on a Rule 29 motion, the court must view the evidence presented in the light most favorable to the government and draw all permissible inferences in the government's favor. *See United States v. Diaz,* 176 F.3d 52, 89 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 181, 145 L.Ed.2d 153 (1999). In addition, the court must "assess the evidence not in isolation but in conjunction", *see id.,* and it "must be careful to avoid usurping the role of the jury", *United States v. Guadagna,* 183 F.3d 122, 129 (2d

---

1. In fact, Borders testified that he had two daughters but no sons. *See* Tr. at 312.

Cir.1999). "[I]f the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt, then [the defendant's] conviction must stand." *United States v. Martinez,* 54 F.3d 1040, 1042 (2d Cir.1995).

A defendant "who challenges the sufficiency of the evidence bears a heavy burden." *Diaz,* 176 F.3d at 89. "The government's case need not exclude every possible hypothesis of innocence, and it is the task of the jury, not the court, to choose among competing inferences." *Martinez,* 54 F.3d at 1043 (internal quotations and citations omitted). "These principles apply whether the evidence being reviewed is direct or circumstantial", and a jury "is entitled to infer from circumstantial evidence that a party had knowledge of a particular fact despite the party's testimony denying such knowledge." *United States v. Best,* 219 F.3d 192 (2d Cir.2000). In short, "[t]he weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal." *Id.*

■ A motion for a new trial pursuant to Rule 33 may be granted "if the interests of justice so require." Fed.R.Crim.P. 33. Whether to grant a motion for a new trial pursuant to Rule 33 rests within the broad discretion of the trial judge. *See United States v. Livoti,* 25 F.Supp.2d 390, 392–93 (S.D.N.Y.1998), *aff'd,* 196 F.3d 322 (2d Cir. 1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1961, 146 L.Ed.2d 793 (2000). However, such motions are not favored and should be granted only with great caution "in the most extraordinary circumstances." *See United States v. Locascio,* 6 F.3d 924, 949 (2d Cir.1993).

## III. Discussion

Barroso challenges his conviction on three grounds. *First,* defendant argues that the government failed to present suf-

ficient evidence of his knowing participation in the charged conspiracy. *Second,* defendant argues that the Court improperly permitted the government to introduce the plea allocution of Marlon Tropeano. *Third,* defendant charges the government with prosecutorial misconduct in connection with its handling of defense witness Lawrence Diadato. Each of defendant's arguments is addressed briefly below.[2]

### A. Sufficiency of the Evidence

■ Barroso contends that "[a]lthough there was evidence to support a finding that a criminal conspiracy existed and that [he] took actions to further its ends, no evidence was offered to support a finding that he knowingly joined the conspiracy with knowledge of its unlawful purpose." Memorandum of Law in Support of David Barroso's Post–Trial Motions ("Def.Mem.") at 2. It is Barroso's position that any evidence concerning his knowing participation in the conspiracy was "at least as consistent with innocence as with guilt". *Id.* at 27–28. Therefore, Barroso argues, he should be acquitted or, in the alternative, granted a new trial.

There is no question that the jury could have reasonably concluded that Barroso was an unwitting "dupe" of the Tropeano brothers. However, there is also adequate—albeit not overwhelming—support for the jury's determination that Barroso knowingly participated in the conspiracy to defraud Briarwood customers. In fact, the taped conversations themselves provide sufficient evidence to permit a jury to find beyond a reasonable doubt that Barroso purposefully engaged in criminal activity.

For example, during his phone conversations with Garrett and Aguanno, Barroso states not just once but numerous times that Don Borders is his "friend." It is undisputed, however, that Don Borders

---

**2.** Although I conclude that defendant's challenges are meritless, I note with appreciation the high quality of defense counsel's post-trial submissions. The moving and reply papers set forth cogent and well-researched arguments, and both are among the finest pieces of written advocacy this Court has received.

was not Barroso's "friend". Indeed, the two men did not know each other.[3] Although the jury could have attributed this discrepancy to casual or loose talk—that is, Borders was a "friend of a friend"—they instead decided it was a product of purposeful dishonesty. Despite defendant's arguments to the contrary, the jury's inference of dishonest intent was reasonable and sufficiently supported by the evidence. This is particularly so in light of the fact that when Garrett and Aguanno told Barroso that their employers and federal authorities were questioning the transfer, Barroso continued to insist that Borders was his friend. Moreover, drawing every inference in favor of the government, Barroso's reaction when questioned about his friendship with Borders was far more consistent with guilt than with innocence. An innocent person, once confronted, would have told Garrett and Aguanno that Borders was actually "a friend of a friend". Similarly, an innocent person would arguably have put the Chatfield Dean brokers in touch with the Tropeanos.

Several other aspects of the phone conversations reasonably provide circumstantial evidence of Barroso's knowing participation in the conspiracy: his anxious insistence that Garrett and Aguanno complete the transfer quickly; his use of the plural pronoun "we" in the statement "[w]e need the money"; his apparent inability to provide the two brokers with a phone or facsimile number for Don Borders, *see* GX 16T; and his detailed statements about Frank Fumazzi and Don Borders, Jr., men who do not exist.[4] True, defense counsel presented the jury with innocent explanations for each of these statements. However, as set forth *supra* Part II, the government "need not exclude every possible hypothesis of inno-

cence, and it is the task of the jury, not the court, to choose among competing inferences." *Martinez*, 54 F.3d at 1043 (internal quotations and citations omitted); *see also Guadagna*, 183 F.3d at 130 ("When making a case based on circumstantial evidence, the government need not 'exclude every reasonable hypothesis other than that of guilt.' ").

In the instant case, the jury chose not to believe the defendant's proffered "hypothesis of innocence" and instead drew inferences in the government's favor. Considering the totality of the evidence including the six conversations, the notarization of the Borders transfer document by Sanchez and the $1900 check, I see no reason to usurp the jury's fact finding role. Accordingly, I decline to overturn Barroso's conviction based on insufficiency of the evidence under either the deferential standard of Rule 29 or the more lenient standard of Rule 33.

## B. Admission of Marlon Tropeano's Plea Allocution

At trial, the government introduced the following portion of Marlon Tropeano's plea allocution for the limited purpose of proving the existence of the charged conspiracy:

The Court: Please state your full name.

The Defendant: Marlon Dean Tropeano

The Court: Did you commit the offense charged?

The Defendant: Yes, I did.

The Court: Tell me in your own words what you did.

The Defendant: I entered into a conspiracy *with others* between March

---

**3.** To be precise, it is undisputed that the "real" Don Borders did not know David Barroso. The defense has suggested that the Tropeanos introduced David Barroso to someone impersonating Don Borders (or Don Borders, Jr.). *See* Tr. at 532; Def. Mem. at

36. Obviously, the jury did not find this suggestion credible.

**4.** The jury may also have drawn inferences of guilt from the tone and manner of Barroso's speaking voice.

of 1997 and April 1998 to commit securities fraud and wire fraud in connection with four accounts at Briarwood Investments by causing unauthorized transactions to be executed in these four accounts at Briarwood Investments and knowing that such transactions would be executed by telephone, fax, into an internal securities clearing house system.

. . . .

Mr. Coleman: Your Honor, could the court inquire whether defendant conspired with one person or more than one person?

The Defendant: Yes, conspired with one or more people.

The Court: Was it more than one?

The Defendant: *It was more than one person.*

Tr. at 304–05 (emphasis added).[5]

Barroso now argues that the Court erred in allowing the government to proffer Marlon's statement that he conspired with "more than one person." *See* Def. Mem. at 2, 43–44. Barroso claims that because Marlon's statement refers to the existence of a coconspirator other than Marlon and Frederick Tropeano, it is "extremely likely" that the jury improperly considered the statement as evidence that "Barroso knowingly joined in the conspiracy." *Id.* at 45. In support of his claim, Barroso points to the jury's "return of a guilty verdict five minutes after hearing a read-back of the Tropeanos' allocutions."

**5.** Marlon Tropeano pleaded guilty before Magistrate Judge James C. Francis, IV. His brother, Frederick Tropeano, pleaded guilty before this Court.

**6.** The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845,

*Id.* at 3. Barroso cites the Court's alleged error as basis for a new trial pursuant to Rule 33.

Barroso's challenge, which implicates the fundamental Sixth Amendment confrontation right[6] as well as evidentiary notions of undue prejudice, is quickly resolved in light of recent Second Circuit precedent. In *United States v. Smith,* 198 F.3d 377, 385 (2d Cir.1999), the Court of Appeals addressed precisely the issue raised here, namely the admissibility at trial of plea allocutions which refer to "other co-conspirators without naming them".

Before addressing the narrow issue presented, however, I briefly discuss the general admissibility of plea allocutions.

**1. Admissibility of Plea Allocutions**

Apart from the phrase "more than one person", defendant does not seriously challenge the admissibility of Marlon Tropeano's plea allocution. Nor does defendant raise any objection to the proffer of Frederick Tropeano's plea allocution. Under prevailing Second Circuit law, defendant could not in good faith maintain a contrary position.

■ Our Court of Appeals has routinely upheld the introduction of codefendants' plea allocutions at trial as probative evidence of the existence of the conspiracy itself. *See, e.g., United States v. Moskowitz,* 215 F.3d 265, 268–70 (2d Cir.2000); *Smith,* 198 F.3d at 385; *United States v. Gallego,* 191 F.3d 156, 167–69 (2d Cir. 1999), *cert. denied,* —— U.S. ——, 120

110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). However, a defendant's Sixth Amendment right to confrontation is not absolute. Out of court statements may be admitted against an accused "when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little if anything to the statements' reliability." *Lilly v. Virginia,* 527 U.S. 116, 124–25, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)(quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)).

S.Ct. 2220, 147 L.Ed.2d 252 (2000). In brief, where a codefendant's plea allocution is delivered under oath, before a judge and subjects the declarant to a "significant and imminent prison sentence", it generally qualifies as a statement against penal interest, *see* Fed.R.Evid. 804(b)(3), and possesses sufficient particularized guarantees of trustworthiness to justify admission at trial—albeit in conjunction with a clear limiting instruction. *Gallego,* 191 F.3d at 167–68; *see also Moskowitz,* 215 F.3d at 269.[7]

Although this Court has long disliked what has become the government's routine tactic of trial by plea allocution, *see, e.g., United States v. Petrillo,* 60 F.Supp.2d 217, 218 (S.D.N.Y.1999)(discussing the government's "typical[ ]" practice of introducing codefendants' plea allocutions as probative evidence of a charged conspiracy), I am bound by the clear precedent of *Moskowitz, Smith* and *Gallego* which are controlling under the factual circumstances presented here. Marlon and Frederick Tropeano faced significant and imminent prison sentences as a result of their allocutions, and both pleaded guilty under oath, before a judge and subject to questioning by the prosecution and the Court. Moreover, the jury's consideration of both pleas was limited by the following instruction:

> You have heard statements from the federal plea allocutions of both Marlon Tropeano and Frederick Tropeano. You may consider these statements as evidence of the activities of the person who made the statements, and that is relevant to the case. You may consider these statements as evidence and, like any other evidence in this case, give these statements such weight as you believe appropriate. Please understand, however, that you may only consider those statements on the following issues: (i) whether there was a conspiracy or scheme to commit securities fraud or wire fraud; and (ii) what, if anything, Marlon and Frederick Tropeano did in order to further the object of the conspiracy.

> If you find, based in part on these statements, that a conspiracy or a scheme as charged in the Indictment existed, you must decide as a separate question whether David Barroso was a part of the alleged conspiracy or scheme.

Tr. at 590–91.

In its moving papers, defendant attempts to distinguish *Gallego* by arguing that the *Gallego* defendants "disputed the very existence of the conspiracy." Def. Mem. at 55. Thus, in *Gallego,* "[t]he plea allocution helped the government prove that a conspiracy existed." Defendant David Bárroso's Reply Brief in Support of His Post–Trial Motions at 41. In contrast, Barroso claims that the existence of a conspiracy was not at issue during his trial. Rather, the only issues were "how big was the conspiracy" and "[d]id it include Barroso." *Id.; see also* Def. Mem. at 53, 55.

Defendant's argument would be more persuasive if it were accurate. It is not. Although defense counsel contended

7. In *Lilly,* a plurality of the Supreme Court concluded that statements against penal interest do not qualify as "firmly rooted hearsay exceptions" for purposes of automatic exemption from the confrontation requirement. *See* 527 U.S. at 134, 119 S.Ct. 1887; *supra* note 6. The Second Circuit has expressly declined to reach the issue. *See Moskowitz,* 215 F.3d at 269 ("[W]e have declined to decide whether a declaration against penal interest admitted under Rule 804(b)(3) is a 'firmly rooted' exception to the hearsay rule."); *Gallego,* 191 F.3d at 167–68 & n. 5 ("As in the past, ... we decline to resolve whether [Rule 804(b)(3)] qualifies as a 'firmly rooted hearsay exception.'"). Thus, it remains unclear whether plea allocutions are automatically admissible or whether they must also possess "particularized guarantees of trustworthiness."

Here, any doubt concerning the status of Rule 804(b)(3) as a "firmly rooted hearsay exception" poses little difficulty. Similar to the *Moskowitz* and *Gallego* courts, and for reasons set forth *infra,* I find that Marlon's plea allocution possessed sufficient particularized guarantees of trustworthiness to justify its admission at trial.

throughout trial that the Tropeanos were proven criminals who clearly had defrauded Briarwood customers, defendant never stipulated to the existence of the alleged conspiracy. Indeed, in its proposed charge, defendant specifically requested that the jury be instructed as follows:

> [T]he Government must prove that two or more persons entered into the criminal conspiracy charged in the indictment—in other words, that the conspiracy actually existed, as described in the Indictment.
>
> . . . .
>
> Unless the Government proves beyond a reasonable doubt that a criminal conspiracy . . . actually existed, you must acquit . . . defendant.

*See* Defendant David Barroso's Requests to Charge at 6–7. And, this language was incorporated in the Court's jury charge. *See* Tr. at 575–77, 581–82. Placing the existence of the conspiracy itself at issue, however minor an issue, was a tactical decision by defense counsel. Defendant ultimately demanded that the government prove a conspiracy—that it prove "two or more persons" agreed to engage in criminal conduct. Defendant cannot now complain that the government used the Tropeanos' plea allocution to meet its burden. Nor can he claim that the plea allocutions were irrelevant to disputed issues at trial.[8]

I now turn to a discussion of the precise issue raised by defendant, the admissibility of Marlon Tropeano's statement that he conspired with "more than one person."

**2. Conspiring with "More than One Person"**

In *Smith*, defendant Benny Smith was convicted of conspiracy to commit extortion in connection with a loansharking scheme headed by codefendant Dennis DeBernardis. *See id.* at 381–82. DeBernardis pleaded guilty prior to trial. *See id.* On appeal, Smith argued that the district court violated his Sixth Amendment confrontation right when it admitted DeBernardis's redacted plea allocution. *See id.* at 385. Smith claimed that "[b]ecause the redacted plea allocution mentioned other co-conspirators without naming them and Smith was the only co-conspirator on trial for conspiracy and extortion . . . the jury may improperly have inferred that DeBernardis named Smith in his plea allocution." *Id.* The Second Circuit rejected Smith's argument—an argument identical to the one advanced by defendant here—finding that it was

> within the district court's discretion to admit the plea allocution of a co-conspirator as a statement against the declarant's interest that the jury could consider as evidence of the existence and scope of the conspiracy. In addition, the plea allocution was not incriminating on its face because it did not directly implicate Smith.

*Id.* (internal citations omitted).

The *Smith* Court further found that admission of DeBernardis's plea allocution

---

**8.** Another tactical decision by defense counsel is relevant to the instant dispute. The government originally planned to proffer only those portions of the Tropeanos' plea allocutions in which the brothers stated that they conspired "with others." *See* Transcript of 2/14/00 Hearing ("2/14/00 Tr.") at 2. However, defendant sought to introduce an additional portion of Frederick Tropeano's plea in which the Court asks, "With whom did you agree? You said you agreed with others, with whom did you agree?" Frederick answered, "Marlon Tropeano." *See id.* at 2–5; 2/13/00 Letter from Defense Counsel Ian Yankwitt and Yuanchung Lee to Judge Shira A. Scheindlin at 7. It was solely in response to this defense request that the government sought to introduce the statement challenged here—Marlon's answer that he conspired with "more than one person." The government persuasively argued that

> the defense should [not] have it both ways. They shouldn't be able to argue that there were only two members of the conspiracy, offer only the portion that supports that and not allow the government to offer the portion of the allocution that there were more than one.

2/14/00 Tr. at 3. Had defendant chosen not to introduce Frederick's follow-up answer regarding the scope of the conspiracy, the government would not have introduced Marlon's follow-up answer.

did not violate *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), the Supreme Court's most recent application of the *Bruton* rule. *See Smith,* 198 F.3d at 385.[9] In *Gray,* the Supreme Court prohibited the proffer of codefendant statements utilizing "redactions that replace a proper name with an obvious blank, the word 'delete' or a symbol, or similarly notify the jury that a name has been deleted." 523 U.S. at 195, 118 S.Ct. 1151. However, in the following colloquy, the *Gray* Court implicitly approved the type of redaction—or language—at issue in *Smith* and in the instant case:

> Additional redaction of a confession that uses a blank space, the word "delete," or a symbol, however, normally is possible. Consider as an example a portion of the confession before us: The witness who read the confession told the jury that the confession (among other things) said,
>
> "Question: Who was in the group that beat Stacey[?]"
>
> "Answer: Me, deleted, deleted, and a few other guys."
>
> Why could the witness not, instead, have said:
>
> "Question: Who was in the group that beat Stacey?"
>
> "Answer: Me and a few other guys."

*Id.* at 196, 118 S.Ct. 1151.

Applying the principles of *Smith* and *Gray* to the instant case, there is little question that Marlon's "more than one person" statement was properly admitted. Marlon's statement is not "incriminating on its face" because it does not "directly implicate" Barroso. *See Smith,* 198 F.3d at 385. Although Marlon's statement "mention[s] other coconspirators", it does not in any way identify those coconspirators. *See id.* Similarly, there is no sub-

stantive difference between the example offered by the *Gray* court—"Me and a few other guys"—and Marlon's statement that he conspired with "more than one person." Both statements make clear that the declarant did not act alone, but neither reveals the identity of the declarant's partners.

*Gallego* and *United States v. Williams,* 927 F.2d 95 (2d Cir.1991), similarly compel the conclusion that Marlon's statement was properly admitted. *Gallego* involved the conspiracy murder trial of Alfredo Gallego and Steven Martinez. During trial, the district court permitted the government to introduce the plea allocution of George Gallego—Alfredo's brother—as probative evidence of the charged murder conspiracy. *See United States v. Gallego,* 913 F.Supp. 209, 211–14 (S.D.N.Y.1996). The proffered allocution stated, in relevant part, as follows:

> Q: Now, sir, did you, as charged in Count One of the indictment ... conspire and agree *with [ ] others,* wilfully and knowingly to [commit murder]?
>
> A: Yes.
>
> Q: Mr. Gallego did you participate in the planning and robbery referred to in Count One of the [ ] indictment?
>
> A: Yes, I did.
>
> Q: And did you make a handgun equipped with a silencer available *to the other participants?*
>
> A: Yes, I did.

*See id.* at 211–12 (emphasis added).

On appeal, the Second Circuit affirmed the trial court's admission of George Gallego's plea allocution finding that

> Gallego faced a significant and imminent prison sentence as a direct result of his

---

9. Although *Bruton* and its progeny concern the admissibility of codefendant confessions during joint trials, courts have applied *Bruton* principles in the context of plea allocutions. *See, e.g., Smith,* 198 F.3d at 385 (citing *Gray,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294); *Petrillo,* 60 F.Supp.2d at 219 n. 2 (citing two *Bruton* cases—*Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) and *United States v. Williams,* 936 F.2d 698 (2d Cir.1991)).

allocution, and ... he delivered the allocution under oath and before a judge. Moreover, the district court admitted only self-inculpatory portions of the allocution, which are particularly trustworthy, and limited the impact of those excerpts by instructing the jury to consider George Gallego's allocution only as evidence of a conspiracy.

191 F.3d at 168.

The phrases introduced in *Gallego*—"conspir[ing] with others" and "other participants"—are functionally equivalent to Marlon's statement that he conspired with "more than one person." All three phrases indicate the existence of a conspiracy consisting of more than two people.[10] In addition, in finding that only "self-inculpatory portions" of George Gallego's allocution were introduced, the Second Circuit necessarily determined that references to "conspir[ing] with others" and "other participants" were, in fact, sufficiently self-inculpatory for purposes of Rule 804(b)(3) and the Confrontation Clause.[11]

In *Williams*, the Second Circuit held that the Sixth Amendment does not bar admission of "redacted confessions in which names of codefendants [are] replaced by neutral pronouns and 'where the statement standing alone does not otherwise connect codefendants to the crimes.'" 936 F.2d at 700 (quoting *United States v. Tutino*, 883 F.2d 1125, 1135 (2d Cir.1989)). *Williams* involved the trial of two codefendants—Williams and McKenzie. At trial, the district court permitted the government to introduce McKenzie's redacted confession. References to Williams were replaced with the words "guy" and "he", as in "[I] met this *guy*, this *guy* said that *he* had met this guy named Freddy." *Id.* at 701 (emphasis added).[12]

On appeal, the Second Circuit affirmed the admission of McKenzie's redacted confession even though "[t]he interlocking of [McKenzie's confession with Williams's confession] all but assured that a jury could identify the person referred to in

---

**10.** Of course, this begs the question of how Marlon's statement that he conspired with "more than one person" is any different from his unchallenged statement that he conspired "with others" or from Frederick Tropeano's unchallenged statement that he conspired "with others." All appear to mean precisely the same thing, that the Tropeano brothers each conspired with more than one person. Arguably, however, the challenged statement is somewhat more precise. While a juror might assume that "others" is boilerplate for one other or many others, the phrase "more than one person" makes clear that at least three people are involved in the conspiracy. Indeed, Frederick Tropeano used the term "others" when he meant only "Marlon."

**11.** In *Moskowitz*, the Second Circuit similarly upheld the trial court's admission of a codefendant's plea allocution in which the codefendant, Jan Kirk, stated that he conspired with "another employee". *See* 215 F.3d at 267–68. Of relevance here, the *Moskowitz* court noted that the government properly redacted "the only portion of the allocution in which Kirk had *shifted blame*, i.e., when he had stated that he had acted 'with the agreement and *at the direction* of another employee at Ferrofluidics.'" *Id.* at 268 (emphasis added).

In the instant case, Marlon's statement that he conspired with "more than person" does not shift blame; it does not in any way indicate that he acted "at the direction" of another person. Rather, like the language approved in both *Gallego* and *Moskowitz*, it directly implicates him as a participant in a criminal conspiracy.

**12.** Defendant argues that *Williams* is inapplicable because it addresses *Bruton* situations in which the hearsay declarant is a codefendant at trial. *See* Def. Mem. at 54–55. This is a distinction without a difference. From the perspective of a Confrontation Clause analysis, a trial codefendant, while physically present, is as unavailable for cross-examination as is an absent codefendant such as Marlon Tropeano. This is precisely why courts sometimes analyze plea allocution issues under the *Bruton* line of cases. *See supra* note 9.

As an additional matter, I find persuasive the reasoning of those courts which have held that *Gray* did not overturn or invalidate *Williams. See, e.g., United States v. Arbalaez*, 98 Cr. 941, 1999 WL 980172, *9–10 (S.D.N.Y. Oct.27, 1999); *United States v. Rucker*, 32 F.Supp.2d 545, 550 (S.D.N.Y.1999).

McKenzie's confession as Williams." *Id.* The *Williams* court found:

> [T]he appropriate analysis to be used . . . requires that we view the redacted confession in isolation from the other evidence introduced at trial. If the confession when so viewed does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to defendant.

*Id.* at 700–01. Here, Marlon's statement, when viewed in isolation, does not incriminate Barroso. The term "with more than one person" is entirely neutral; in fact, it is more neutral than "he" or this "guy" because it does not indicate gender.[13]

### 3. Unfair Prejudice

Federal Rule of Evidence 403 permits the exclusion of relevant evidence where the probative value of such evidence "is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. On balance, I find that Marlon's statement was not unduly prejudicial.[14]

*First,* the existence of the charged conspiracy was at issue and Marlon's plea allocution, including the challenged statement, was highly probative of that issue. *See supra* Part III.B.1. *Second,* this Court gave the jurors a comprehensive limiting instruction, precluding them from considering Marlon's statement as any evidence of Barroso's participation in the conspiracy. *See supra* Part III.B.1. *Third,* defendant was permitted to impeach Marlon's credibility through the proffer of evidence regarding Marlon's prior state court convictions for fraud and forgery. *See* Tr. at 365. *Fourth,* the Court allowed defendant to introduce a portion of Frederick Tropeano's plea allocution in which Frederick states that he conspired only with "Marlon." *See* Tr. at 306–09.

That the jury convicted defendant five minutes after hearing a read-back of Marlon's plea allocution is irrelevant. It is sheer speculation to infer that this evidence played a disproportionate role in the jury's deliberations.

\*　　\*　　\*　　\*　　\*　　\*

In light of clear precedent, the neutral "more than one person" language, my limiting instruction to the jury and the proffer of impeachment material, I find both that Marlon Tropeano's plea allocution was properly admitted and that it did not unfairly prejudice defendant such that a new trial is warranted in the "interests of justice." Accordingly, defendant's Rule 33 motion is denied on this ground.

### C. Prosecutorial Misconduct

As set forth above, defendant's third challenge to his conviction concerns the government's handling of defense witness Lawrence Diadato. Prior to the commencement of trial, the government informed defendant that it would be calling Diadato as a witness. In response, defense counsel demanded that the government produce Diadato's "rap sheet" of prior convictions. The government refused. On February 14, during the final pretrial conference, I ordered the government to produce Diadato's rap sheet. *See* 2/14/00

---

**13.** Defendant's almost total reliance on the district court's opinion in *Petrillo* to support its claim, *see* Def. Mem. at 45–52, is puzzling. Although *Petrillo* provides a thoughtful and thorough post-*Lilly* analysis of Second Circuit plea allocution law, its factual findings do not differ fundamentally from any of the cases cited by the government or by this Court. *See* 60 F.Supp.2d 217. Indeed, the *Petrillo* court concluded that the plea allocutions at issue in that case were properly admitted at trial. *See id.* at 219–20. Moreover, the circumstances surrounding the *Petrillo* allocutions appear to be no more compelling than those at issue here. However, because the text of the challenged plea allocutions is not set forth in the district court's opinion a precise comparison is impossible.

**14.** Although defendant does not explicitly cite Rule 403, his reference to the "prejudice" he suffered as a result of Marlon's statement, *see, e.g.,* Def. Mem. at 44, clearly implicates such an analysis.

Tr. at 23. Later that evening, the prosecutors informed defense counsel that they were no longer planning to call Diadato as government witness.

At trial, Diadato testified as a witness for the defense. On cross-examination, the government challenged Diadato's credibility and impeached him on the basis of several prior fraud convictions, including one prior conviction for securities fraud. Barroso now argues that the government acted improperly by not providing the defense with information regarding Diadato's prior convictions. In addition, Barroso claims that by undermining Diadato's credibility "even though it had called him before the grand jury; even though it had intended to call him as its own witness at trial less than one week earlier; [and] even though [it] had apparently accepted Diadato's explanation regarding his role in the transfer of the accounts", the government misled the jury into "disbelieving what is actually true." Def. Mem. at 21, 58. Based on this alleged misconduct, defendant seeks a new trial pursuant to Rule 33. Defendant's argument is not persuasive.

█ *First,* as defendant himself concedes, "the [g]overnment is of course not required to turn over [rap sheets] for defense witnesses." *Id.* at 60. Diadato was a defense witness. The government informed defense counsel prior to trial that it would not be calling Diadato, and therefore it was not required to produce defendant's rap sheet.

█ *Second,* that the government called Diadato to testify before the grand jury and was considering calling him as a witness at trial does not preclude the government from impeaching or otherwise challenging Diadato's testimony during cross-examination. Indeed, "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Fed.R.Evid. 607. Defendant's additional claim—that the government improperly undermined evidence it "believed" to be true—is wholly speculative. Simply be-

cause Diadato testified before the grand jury and appeared on the government's preliminary witness list does not mean the government "believed" Diadato to be truthful. In fact, that the government ultimately decided not to call Diadato as a witness suggests exactly the opposite.

## IV. Conclusion

For the foregoing reasons, Barroso's post-trial motions for a judgment of acquittal or, in the alternative, a new trial are denied.

SO ORDERED.